LOTTINGER, Judge.
This suit was filed by American Casualty Company, as plaintiff, and against the Town of Port Allen and its liability insurer, the Travelers Insurance Company, 'as defendants, for recovery, under a subrogation claim, of damages paid plaintiff’s assured, Miss Emma Landry, as a result of a fire and explosion at her residence in Port Allen. The Lower Court found judgment in favor of defendants and dismissed petitioner’s suit at petitioner’s cost. The petitioner has taken an appeal.
This suit arose out of an explosion and fire which occurred at approximately two o’clock a. m. on February 17, 1966, and which destroyed the home of Miss Emma Landry situated in the City of Port Allen, Louisiana. At the time of the accident, the petitioner had in full force and effect a policy of insurance providing for protection to Miss Landry for damage to the dwelling and contents. As a result of the explosion and fire, and by stipulation of counsel, petitioner paid Miss Landry the sum of $17,400.00 and became subrogated to her rights to recover from the parties responsible for the loss. Petitioner filed suit against the Town of Port Allen and its insurer, Travelers Insurance Company, the defendants, alleging the Town of Port Allen to be responsible for this loss. Other cases were consolidated with this suit, however they are not before us at this time.
The petitioner contends that the explosion and fire resulted from natural gas leaking from the natural gas system owned and operated by the City of Port Allen into Miss Landry’s home through the sewerage system, which caused the explosion and fire. Defendants, of course, denied that the accident occurred in this manner and claimed that the explosion was caused by either an accumulation of sewer gas or a malfunctioning heating system in the Landry home.
The evidence discloses that during the night of February 16, 1966, after a day of slow and steady rain, Miss Landry noticed that the toilets in her house were behaving strangely by making a peculiar bubbling or gurgling noise. A similar but less serious *314 effect was being noticed by Miss Landry in the drain in her heater closet. As Miss Landry lived alone and was concerned about the situation, at approximately ten o’clock p. m. she attempted to call her nearest neighbor, a Mr. Ducote, who wasn’t in, so she called upon other neighbors, Mr. and Mrs. Burgoyne, for help. The Burgoynes went to Miss Landry’s house where they observed the condition and Mrs. Burgoyne helped Miss Landry clean some water which had splashed off the bathroom floor. Mayor William Le-Blanc, of Port Allen, was called by Mrs. Burgoyne and he appeared at the Landry home at approximately ten thirty o’clock p. m., where he observed the splashing in the commodes and the water under the heater. Mayor LeBlanc reassured Miss Landry that there was no danger.and said he would have someone look into the things in the morning and left the Landry home about eleven o’clock.
At approximately twelve thirty o’clock a. m. Miss Landry went to bed and fell asleep. At this time, Fire Chief Thomas Hebert was on duty at the Port Allen fire department station. At approximately one o’clock a. m. on the morning of February 17, 1966, as he was trying to get to sleep he heard a “terrific explosion” and noticed the sky was lit up in the direction of the Landry home. After receiving several phone calls before getting the right address, the Fire Chief drove to Miss Landry’s home where he found what he called a “working fire”. He described the Landry home as “pretty well apart”. The only thing Chief Hebert found standing at Miss Landry’s house in most areas was the stud work, although he was on the scene some eight minutes after the explosion.
During the course of the mop-up operations after the fire, one of Chief Hebert’s firemen called to his attention the fact that they were getting a flare-up at a certain location in the debris in the area of the bathroom. Chief Hebert observed the flame and in order to control this flame which appeared to come from the opening from where the commode had previously been, had a fireman install a railroad flare in the opening. After this was done, the flare-up continued at regular intervals in spurts, the flame being about a foot high. This flare-up or flame would occur some every thirty to forty seconds. Upon noticing these flare-ups, Chief Plebert double checked to determine that the gas meter on Miss Landry’s house had been cut off, which it was.
The record discloses that the gas line from this meter runs from the Landry house in a southerly direction underneath the street in front of Miss Landry’s house to the opposite side of the street where it connects with the gas main.
Following the explosion and fire, bubbles were noted on the shoulder of the road across the street from the Landry home. The entire service line from the main to the house was removed and subjected to a pressure tank, which disclosed that there were two tiny pin-hole leaks approximately one thirty-second or one sixty-fourth inch in diameter located within two feet of where the service line tied into the main. These leaks were some sixty feet from the Landry home. The meter and regu-later were checked and no defects were found. Subsequently, Chief Hebert conducted a thorough investigation and concluded that the explosion and fire were caused by an accumulation of gas ignited by the central heater in the Landry home. He was unable, however, to identify the type of gas or its source.
The petitioner alleged and sought to prove that the gas escaping from the two pin-hole leaks across the street from Miss Landry’s house traveled along the gas service line some sixty-seven feet where it abruptly left the line, traveled downward some eighteen inches into the sealed sewer line. The plaintiff further alleged that the gas then entered the Landry home through the sewer line and forced its way up through the seals in Miss Landry’s com *315 modes despite the fact that the sewer was properly vented.
The physical layout of the sewer and gas systems discloses that the gas main was a one and one-half inch line located approximately two feet below the surface of the ground on the south side of Maryland Street, which is on the opposite side of the street from Miss Landry’s property. The gas service line to the Landry residence was a three-quarter inch line which ran sixty-seven feet from the main to the gas meter located on the west side of Miss Landry’s house near the southwest corner. The pressure in this service line was approximately fifteen pounds per square inch. The gas service line was laid approximately six feet to the west of Miss Landry’s house. When the line reached a point opposite the meter the line made a right angle turn, ran approximately five feet toward the house and then made another right angle turn up to the meter. In the vicinity of the house the gas service line was roughly twelve inches below the surface of the ground.
The sewerage main was laid down the center of Maryland Street and was approximately six feet deep at the tie-in for the service line from the Landry home. The sewerage service line was also laid on the west side of the house approximately twelve inches west of the slab at approximately the point of where the gas service line turned up to the meter, the sewerage line was roughly two and one-half feet below the ground and eighteen inches below the gas service line. This is the closest point between the gas and sewerage line. Until the gas line made the turn toward the house, the two lines were separated at least five feet horizontally and at least eighteen inches vertically.
As shown by the evidence, the sewerage service line was tied-in to the house near the rear on the west side. The line was four inches in diameter to the commodes and two inches to the remaining fixtures. The house is well vented with a three inch vent for the commodes and a one and one-half inch vent each for the tub, sink and washer. Each drain connection with the sewer line was protected by a water seal or “P” trap. Vents and “P” traps are designed to prevent the flow of gas into a house through the sewers. Both the vents and the drains are connected directly to the sewerage line. The vents, however, go straight up through the roof and are exposed to the atmosphere. The drain lines all contain “P” traps between the sewerage line and the drain opening to the atmosphere. In the sinks, tubs and light fixtures, the “P” traps are a vertical double bend in the drain pipe which leaves a loop of water between the fixture and sewer connections. In the commode, the water in the bowl itself forms a trap. The drain pipe exists from the lower portion of the bowl, turns upward until it is above the level of the water in the bowl, and then turns back downward to the sewer. The water seal in the bowl is roughly four or five inches deep and always above the level of the floor.
The testimony discloses that these strange bubbling or gurgling sound occurrences in the commodes in Port Allen during heavy rainfalls are not at all uncommon. It is caused by a hydraulic problem in the Port Allen sewerage system. This is probably what Mr. and Mrs. Burgoyne and Mayor LeBlanc thought they observed with Miss Landry prior to the explosion.
Although petitioner tried to develop some connection between the flare-up which Fire Chief Hebert observed in the commode, and the cutting off of the gas line by Mr. Berthelot following the explosion, we feel that such a connection was clearly discounted by the cross-examination of Chief Hebert. Chief Hebert testified that he was not present when the line was cut and although these flare-ups were occurring prior to the cutting of the line, he did not notice them subsequent to the disconnection of the line. However, he was unable to say with any degree of certainty whatsoever whether these flare-ups stopped *316 at the exact time the line was cut, or whether they stopped prior to the cutting or subsequent thereto.
Mr. Owen, who testified as an expert on behalf of defendant, testified that the blue flash or flame coming from the commode, as testified by Chief Hebert, was characteristic of sewer gas. He testified that sewer gas has approximately the same density as air and would not flow like natural gas. He, therefore, was of the opinion that the irregular intervals at which this flame was noticed was probably attributable to the hydraulic pressure forcing sewer gas out of the system.
Fire Chief Hebert testified that his investigation revealed that the explosion was caused by an accumulation of gas ignited by the central heating unit. He was unable to draw any conclusion as to either the source or the kind of gas involved.
Petitioner attempts to shift the burden of proof to defendant by applying the doctrine of res ipsa loquitur. The evidence discloses that the defendant owns the gas distribution system and is responsible for the maintenance of gas service lines to the gas meter located outside each house. The property owner, however, is responsible for the gas system from the meter throughout the house. The defendant also maintains a sewer system and is responsible for the installation and maintenance of the sewer lines up to the property line, but within the boundaries of the property, the responsibility for maintaining the sewer lines is on the property owner.
The evidence established that the explosion occurred at or around the heating unit located in approximately the center of the Landry home. This area of course was under the exclusive control of Miss Landry. Therefore, the doctrine of res ipsa loquitur is not applicable as the jurisprudence of this state is well established to the effect that where an explosion occurs on premises over which the gas company has no control, the burden is on the injured party to prove the negligence of the gas company proximately causing the damage. A. & J., Inc. v. Southern Cities Distributing Company, 173 La. 1051, 139 So. 477.
In Bayou Materials, Inc. v. City of Donaldsonville, 192 So.2d 373, this Court held that the petitioner may rely upon circumstantial evidence to prove a claim of causation in an action for damages resulting from a gas explosion, provided that such evidence excludes any other cause to a reasonable degree of certainty. In that case we said:
“In the case of Naquin v. Marquette Casualty Co., 143 So.2d 122, the Court of Appeal for the 3rd Circuit, citing as authority the A. & J., Inc. case, held that res ipsa was not applicable when the defendant had no control over the premises and rendered judgment against the plaintiff because he had not shown that the proximate cause of the accident was escaping gas from the town’s gas line.
Certiorari being granted, the Supreme Court held (244 La. 569, 153 So.2d 395) that proof in the chain of causation may be supplied by circumstantial evidence provided all hypotheses to the contrary are eliminated to a fair degree of certainty. Under this decision, a plaintiff may now rely upon circumstantial evidence, as defined therein, to establish his chain of causation. Such circumstantial evidence must exclude any other cause to a reasonable degree of certainty and when so established the alleged negligence vel non of the defendant’s agents may be then considered.”
We do not believe that the theory, as set forth by petitioner, has been sufficiently proven so as to exclude any other cause of the explosion to a reasonable degree of certainty. In support of its contention the petitioner introduced as an expert witness Mr. Paul G. Merritt, who explained his theory that the gas from the two pin-hole leaks under the street followed the gas line until it reached the vicinity of the gas meter and then went down eighteen inches to enter the sewer *317 line and then followed the line into the home of petitioner through the commode and the drain in the heater room. On cross-examination, however, Mr. Merritt admitted that no gas could bubble through the commode unless and until water in the vents reached the level of the water in the commode traps, thus nullifying the back pressure of the traps. In the commodes, the trap in the water is the bowl itself, and, therefore, no gas could bubble through the commode unless and until water in the vents reached the level of water in the bowls. Applying the principle that water always seeks its own level, we know that the water in the vent pipe could not have been four or five inches above the floor (as in the water in the commode bowl) because then there would have to be water four or five inches deep in the entire house, and theer was no water in the house prior to the explosion. The record discloses that such definitely was not the case.
Mr. Eugene-Owen, who was called as an expert witness by the defendant, testified that there were only two possible sets of circumstances under which the explosion could have occurred as alleged by petitioners. The first possibility was that the gas flow in the sewer exceeded the venting capacity in the Landry house. Mr. Owen calculated that the gas flow would have to be 26,200 cubic feet per hour before the vents would be overcome and the first bubble would pass through the commode. The three inch vent to the commode alone had a capacity of 17,200 cubic feet an hour. On the other hand, the amount of gas escaping from the hole one thirty-second of an inch in diameter at fifteen pounds per square inch would only be about three cubic feet per hour. Therefore, the flow at the leaks across the street from the house was only approximately six cubic feet per hour, and the testimony shows that at least a part of this gas was bubbling up in the street. Assuming that some gas from these leaks under the street could have entered petitioner’s sewer system, as theorized by petitioner, we feel that the defendant has adequately shown that the vents installed in the petitioner’s house were entirely adequate to take care of any flow of natural gas which might have entered into the sewer line through the pinholes under the street.
Mr. Owen testified that the only other contingence in which gas could have bubbled through the commodes would be if the water level in the vents reached the level of the commode bowl, therefore nullifying the back pressure or seal of the water in the bowl. In other words, the vents would be the path of least resistance unless and until the water level in the vents was the same as the water level in the commode bowl. In that case, the “P” trap would be ineffective in forcing any gas up the vents. We know that this did not occur because, as water seeks its own level, the water in the house would have had to have been at the same level as that in the vents and the testimony is to the contrary.
We, therefore, feel that the petitioner has failed to prove its case by a preponderance of the evidence, and find no error in the decision of the Lower Court. Accordingly, the judgment of the Lower Court will be affirmed, all costs of this appeal to be paid by petitioner.
Judgment affirmed.